The BEACON JOURNAL PUBLISHING COMPANY, Plaintiff–Appellant,

v.

The AKRON NEWSPAPER GUILD, LOCAL NUMBER 7, Defendant–Appellee.

No. 96–3562.

United States Court of Appeals, Sixth Circuit.

Argued April 21, 1997.

Decided June 5, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied July 23, 1997.

Jeremy P. Sherman (argued and briefed), Kristin E. Michaels (briefed), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Plaintiff–Appellant.

Douglas J. Paul (argued and briefed), Chattman, Sutula, Friedlander & Paul, Cleveland, OH, for Defendant–Appellee.

Before: JONES, SUHRHEINRICH, and SILER, Circuit Judges.

## OPINION

NATHANIEL R. JONES, Circuit Judge.

Plaintiff Beacon Journal Publishing Company ("the Beacon Journal") appeals the district court order granting Defendant Akron Newspaper Guild Local Number 7's ("the Union") motion for summary judgment. In granting the motion, the district court enforced an arbitration award favorable to the Union. The Beacon Journal asserts that the award ignores the express terms of the par-

ties' collective bargaining agreement and that the arbitrator unreasonably created new conditions not provided for in the agreement. For the following reasons, we reverse the district court's grant of summary judgment and vacate the arbitrator's award.

## I.

The Beacon Journal publishes a daily newspaper in Akron, Ohio. The Union is the bargaining representative for all non-supervisory employees in the Beacon Journal's editorial department, which contains approximately 150 people. These non-supervisory employees include reporters, copy editors, photographers, library assistants, secretaries, and maintenance personnel.

On July 23, 1993, the Beacon Journal and the Union entered into a collective bargaining agreement. This collective bargaining agreement is the most recent labor contract in a labor-management relationship that extends back to at least 1972. Article VII of the collective bargaining agreement provides for arbitration of all unresolved grievances involving the "interpretation, application, administration or alleged violation" of the labor contract.

The current arbitration arose under Article XIII, section 3 of the Collective Bargaining Agreement, which provides:

> EMPLOYER may exercise the right to assign vacations. However, it is understood that preference as to choice of time shall be given to employees in the order of seniority by desk or department.[1]

Since 1972, the Beacon Journal has handled the vacation process in the same manner. At the beginning of the year, the Beacon Journal would send around a memorandum designating the times that members of the Union could sign up for vacations. The Beacon Journal typically would create three vacation slots for every week of the year except Thanksgiving, Christmas, and New Year's, when only two slots were available. Additionally, the Beacon Journal would not schedule any vacation slots for election weeks, because of press demands. Once the Beacon

---

**1.** This language has remained virtually un-  changed since at least 1972.

Journal posted the slots, employees would sign up in order of seniority.[2]

The current dispute arose from the establishment of new exempt editorial positions in the 1989 and 1991 collective bargaining agreements. In 1989, the Beacon Journal created three exempt supervisory positions, and in 1991, it added a fourth exempt supervisory position. The new supervisors were former members of the Union and continued to perform many of the same duties they had performed prior to being promoted.

The parties' Collective Bargaining Agreement reflected these changes. Article I of the Collective Bargaining Agreement provides in pertinent part:

This Agreement covers all employees ... except ... one executive news editor, one Sunday news editor, one deputy news editor, one copy desk chief....

After the amendment, the Beacon Journal did not change the process of assigning vacations. Thus, the four newly promoted employees took their vacation as they had in the past, by signing on the memorandum in order of seniority with the collective bargaining employees.[3]

Ultimately, the Beacon Journal found this approach problematic because it needed to assure that exempt supervisors did not take vacation at the same time as exempt managers. These members were indispensable to the company, and thus, at least one of the exempt supervisors had to be at work at all times. Consequently, the Beacon Journal unilaterally decided to allow the supervisors to work out their vacation schedules first, so their vacation schedules would not overlap with those of other management employees. Under the new process, the Beacon Journal treated the new four supervisory employees as it did all of its other supervisory employees.

2. The Beacon Journal also restricted how many employees from a certain department could sign up for the same week. This procedure allowed the Beacon Journal to ensure adequate staffing throughout the year, which the Beacon Journal has maintained is of paramount importance.

3. The Beacon Journal, however, continued to schedule its other exempt senior level employees separately from members of the Union. Only the

These changes took effect in 1993. The company deducted the weeks the supervisors took from the available slots offered to bargaining unit employees, which the company apparently had never done in the past when its other exempt supervisors scheduled vacations. Thus, under the new regime, bargaining unit employees with more seniority than the supervisors had to schedule their vacation time after these "less senior" supervisors. The parties settled the problem in 1993, but did not agree to a policy for future years.

In 1994, the Beacon Journal once again used the new vacation system. This time the parties could not resolve their differences. Thus, the Union filed a grievance against the Beacon Journal.[4] The Beacon Journal denied the grievance, and it was presented to an arbitrator selected by the Beacon Journal and the Union pursuant to their collective bargaining agreement.

The arbitrator framed the issue for arbitration as follows:

Did the management of the Akron Beacon Journal have the right, under the terms of the labor agreement, to change the method of establishing priorities for vacation schedule for the exempt supervisory positions? The positions involve the Copy Desk, the National Desk and the News Desk? If not, what is the remedy?

Arbitrator's Decision, Slip op. at 1. The arbitrator held a hearing on August 8, 1994, at which both parties presented evidence to the arbitrator. On October 29, 1994, the arbitrator sustained the Union's grievance.

In his report, the arbitrator first delineated the aforementioned factual history. He found that the supervisory employees were not part of the bargaining unit. The arbitrator recognized that while these supervisors were no longer part of the Guild they contin-

four new supervisors were included in the Union members' vacation slot process.

4. The Union has never claimed, and does not now claim, that exempt supervisors, other than the four involved in this dispute, are subject to the bargaining unit seniority claims for the purposes of vacation scheduling.

ued to perform some of the "tasks performed by Guild members." Interestingly, the Union did not present any evidence that a member had "to modify or change his/her vacation plans due to the management's 'new' interpretation of its rights under the vacation and management rights clauses of the labor agreement." Arbitrator's Decision, Slip op. at 6. In contrast, management was "vague on the specifics of not being able to meet the necessities of the supervisors and the production needs of the newspaper." *Id.*

The arbitrator made no further findings, but instead found that the Union's grievance was justified. He then crafted his own solution, whereby the four new supervisors and the Union employees were thrown into a "seniority pool" for vacation selection purposes. He also provided for a grievance procedure through the Union for employees that believed they were adversely affected by the new procedure.

The Beacon Journal refused to comply with the arbitration award and instead instituted this lawsuit under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The parties filed cross-motions for summary judgment, and the district court enforced the award. The Beacon Journal filed this timely appeal.

## II.

This court reviews the district court's grant of summary judgment *de novo. Rowley v. United States,* 76 F.3d 796, 799 (6th Cir.1996). Nevertheless, our scope of review, like the review of the district court, is extremely limited.

■ The Supreme Court has made clear in the *Steelworkers' Trilogy* [5] and its progeny that courts must accord an arbitrator's decision substantial deference because it is the arbitrator's construction of the agreement, not the court's construction, to which the parties have agreed. *See United Paperworkers Int'l Union v. Misco,* 484 U.S. 29, 37–8, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987)

("Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept."). Hence, our review is extremely limited. We review the arbitrator's decision *only* to determine whether the arbitrator was "arguably construing or applying the contract and acting within the scope of his authority." *Id.* at 38, 108 S.Ct. at 371. If the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely the arbitrator's "own brand of industrial justice," the award is legitimate. *United Steelworkers of Am. v. Enterprise Wheel & Car Co.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). Courts will not weigh the merits of the claim or determine whether the claim is supported by language in the written instrument; otherwise, the policy of settling labor disputes through arbitration would be undermined. *Misco,* 484 U.S. at 36, 108 S.Ct. at 369–70; *see also United Steelworkers of Am. v. American Mfg. Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960) ("[C]ourts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim.").

■ Despite the great amount of deference accorded an arbitrator's decision, our review is not toothless when an arbitrator's award disregards the collective bargaining agreement and its terms. *See Lattimer–Stevens Co. v. United Steelworkers,* 913 F.2d 1166, 1171–72 (6th Cir.1990) (Boggs, J., dissenting) (delineating cases setting aside arbitrator's decision). Even though arbitrators are not flawless, courts must refrain from reversing an arbitrator simply because the court disagrees with the result or believes the arbitrator made a serious legal or factual error. *Misco,* 484 U.S. at 38, 108 S.Ct. at 371 ("that a court is convinced [the arbitra-

---

**5.** *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers of Am. v. Warrior & Gulf Navig. Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of Am. v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

tor] committed serious error does not suffice to overturn his decision."). However, an arbitrator does not have unfettered discretion and when he or she departs from "even arguably construing the contract," this court must vacate the award. *See Enterprise Wheel*, 363 U.S. at 597, 80 S.Ct. at 1361 ("When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award."). In fact, since *Misco*, this court has not backed away from reviewing an arbitrator's decision when that decision departs from any conceivable interpretation of the contract. *See, e.g., Ficks Reed Co. v. Local Union 112*, 965 F.2d 123, 126 (6th Cir.1992) (affirming district court's decision to vacate arbitrator's award); *International Ass'n of Machinists v. Lourdes Hosp.*, 958 F.2d 154, 157 (6th Cir.1992) (vacating arbitrator's decision).

██ The key issue in this case is whether the arbitrator's award draws its "essence" from the terms of the collective bargaining agreement. An arbitrator's award fails to draw its essence from the agreement when:

(1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on "general considerations of fairness and equity" instead of the exact terms of the agreement.

*Dallas & Mavis Forwarding Co. v. Local Union No. 89*, 972 F.2d 129, 134 (6th Cir. 1992) (quoting *Cement Divisions, National Gypsum Co. v. United Steelworkers of Am.*, 793 F.2d 759, 766 (6th Cir.1986) (citations omitted)). In this case, the arbitrator's award does not conflict with express terms of the agreement, but it does impose additional requirements not found in the contract, is not rationally supported by or derived from the agreement, and is based on general considerations of fairness and equity rather than the exact terms of the agreement. Thus, the district court erred in not vacating the award.[6]

This case is very similar to *Lourdes Hospital*. In *Lourdes Hospital*, the union filed a complaint when a part-time employee was called back to work on an unscheduled weekend and did not receive overtime pay. 958 F.2d at 156. The arbitrator found that the employee was not entitled to overtime under the contract, but did find that the hospital abused its power to schedule. *Id.* Thus, the arbitrator ruled in favor of the employee. *Id.* The district court affirmed the arbitration award, and this court reversed. *Id.* at 156–57. This court found that the hospital could not abuse a right specifically given to it in the collective bargaining agreement—the right to schedule. *Id.* at 157. We further found that the arbitrator imposed his own brand of industrial justice by creating a contract term requiring notice of all schedule changes. *Id.*

In this case, the four supervisors are specifically exempt from the collective bargaining agreement and, thus, not subject to the vacation provisions of the agreement. Moreover, the Beacon Journal has the exclusive right to schedule vacations. Consequently, the Beacon Journal did not violate a specific provision of the collective bargaining agreement by doing something it had a right to do—schedule vacation slots after its supervisors had chosen when to take their vacations.

██ Furthermore, the arbitrator imposed his own brand of "industrial justice" in this case by crafting guidelines that do not even arguably derive themselves from the contract. It appears that the arbitrator imposed these guidelines in an effort to form a "better solution" for the parties than that which could be found in the terms of the agreement itself. This is in direct contravention of the principle that awards not be based on principles of fairness, but instead on precise terms of the collective bargaining agreement. The arbitrator's decision violates the very touchstone of arbitration—that the award "draw its essence" from the collective bargaining agreement.

6. In so holding, we must add that the strong desire of courts to ensure that fairness and equity are accorded creates a difficult chore in these cases. Yet, first and foremost, judges and arbitrators are mandated to respect the agreement the parties have reached.

Unable to point to a contractual basis for the arbitrator's award, the Union argues that the award was based upon an unwritten past practice. Arbitrators commonly utilize past practice or industry customs to interpret the meaning of ambiguous, or even general, terms and clauses in a contract. *See Perry v. Million Air,* 943 F.2d 616, 619 (6th Cir.1991) (recognizing that the arbitrator may use past practice and industry customs to interpret the collective bargaining agreement); *see also Excel Corp. v. United Food and Commercial Workers,* 102 F.3d 1464, 1468 (8th Cir.1996) ("[A]n arbitrator can and should consider the parties' past practices and 'common law of the shop' to determine the scope of their agreement."); *Strathmore Paper v. United Paperworkers Int'l,* 900 F.2d 423, 427–28 (1st Cir.1990) (holding that arbitrator may factor in past practices when attempting to interpret the collective bargaining agreement). But past practice or custom should not be used to interpret or give meaning to a provision or clause of the collective bargaining agreement that is clear and unambiguous. *Excel Corp.,* 102 F.3d at 1468; *Keebler Co. v. Milk Drivers and Dairy Employees Union,* 80 F.3d 284, 288 (8th Cir.1996) (holding that arbitrator may look to past practice only to interpret ambiguous terms and not to add new terms to an already clear agreement); Frank Elkouri and Edna Asper Elkouri, How Arbitration Works 454 (4th ed. 1985) ("While custom and past practice are used very frequently to establish the intent of contract provisions which are so ambiguous or so general as to be capable of different interpretations, they ordinarily will not be used to give meaning to a provision which is clear and unambiguous.").

The terms of the agreement are clear in this case. While the Beacon Journal may have included its four new supervisors in with bargaining unit employees for a short period of time, it never rescinded its right to schedule vacations. Hence, the Beacon Journal retained the right to unilaterally change its vacation policy; to hold that once the Beacon Journal sets forth a vacation policy, it is bound by it, would be incongruous with the collective bargaining agreement.

Finally, and perhaps most importantly, even if the Union was correct, the arbitrator's findings foreclose the Union's argument. The arbitrator specifically stated that "[t]he vacation and job assignment procedures have not been clear cut in the past or in recent years." Arbitrator's Decision, Slip op. at 6–7. Simply put, the arbitrator did not find that a past practice existed.

### III.

Accordingly, we hereby **REVERSE** the decision of the district court affirming the arbitration award and **VACATE** the arbitrator's award.