INTERNATIONAL UNION OF ELEC-
TRONIC, Electrical, Technical, Sala-
ried, Machine and Furniture Workers,
AFL–CIO; and Local 791, Interna-
tional Union of Electronic, Electrical,
Technical, Salaried, Machine and Fur-
niture Workers Plaintiffs–Appellees,

v.

HURD CORPORATION, Defendant–
Appellant.

No. 00–5016, 00–5119.

United States Court of Appeals,
Sixth Circuit.

Feb. 20, 2001.

Before BOGGS and MOORE, Circuit Judges; and COHN,* District Judge.

OPINION

KAREN NELSON MOORE, Circuit Judge.

The International Union of Electronic, Electrical, Technical, Salaried, Machine and Furniture Workers and its local counterpart ("Union") brought suit in the East-

---

* The Honorable Avern Cohn, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

ern District of Tennessee seeking enforcement of an arbitrator's award ordering payment of accrued vacation benefits from the Hurd Corporation ("Hurd") to certain of its employees. On cross-motions for summary judgment, the district court granted summary judgment to the Union by upholding the arbitrator's award but in a later order the district court set aside its award of attorneys' fees to the Union. Hurd appeals the district court's grant of summary judgment, arguing that the arbitrator's award contradicts the express terms of the parties' Collective Bargaining Agreement. For the foregoing reasons, we REVERSE the district court's judgment and VACATE the arbitrator's award.

## I. BACKGROUND

Hurd Corporation, located in Greeneville, Tennessee, manufactures and sells automobile locks and related equipment. The Union is the certified collective bargaining agent of all the employees involved in this action. The parties are bound by a Collective Bargaining Agreement ("the Agreement"), which covers the period October 1, 1994 through September 30, 1997.[1] This case involves the allocation of employee vacation benefits pursuant to Article 13 of the Agreement. Article 13 provides, in pertinent part, as follows:

Section 1. Employees will receive vacation with pay if they are regularly employed by the Company and have one (1) full year seniority or more, subject to the additional qualifications

(A) Each employee having one (1) or more year's seniority as of June 1, 1994, and each subsequent June 1st for the duration of this Agreement will be entitled to vacation pay provided he/she has worked seventy-five percent (75%) of the regularly scheduled pay periods ending with June 1st.

(B) An employee who is laid off from work as the result of a legitimate illness supported by satisfactory medical evidence (or if an employee retires within the eligibility period for vacation) greater than thirteen (13) weeks and does not exceed 26 weeks, his/her vacation pay shall be ½ the full vacation benefit plus $\frac{1}{12}$ of the other ½ of the vacation benefit for each week in excess of the 26 weeks he/she works up to 39 weeks. Any employee who works 39 weeks shall be entitled to a full vacation benefit.

J.A. at 49. Pursuant to the terms of Article 13, an employee must work one full year to be eligible for vacation with pay. Section 1(A) governs those employees who, subsequent to the first year, have worked 75%, or at least 39 weeks, of the following year. According to the Agreement, these employees receive paid vacation.[2] The subject of this dispute is the fate of those

1. Substantially the same Agreement between the parties has been renewed since 1979. The Agreement provides for arbitration as the last step of the grievance procedure.

2. The Union initially brought its grievance to establish the meaning of the term "regularly scheduled pay periods" as used in Section 1(A) of the Agreement. Prior to 1997, Hurd had counted the number of pay periods, as opposed to the number of actual hours worked, when it determined the number of weeks that could be counted toward paid vacation. Hurd allowed its employees to treat as a "pay period" any week in which an employee worked more than 39 minutes. After using this method of accounting for 15 years, Hurd attempted in 1997 to calculate a pay period based on a 40–hour work week. The Union objected because this significantly reduced the number of weeks that employees could count toward paid vacation benefits. The grievance was arbitrated and the arbitrator, in the first of three decisions he issued, determined that Hurd could not change its past practice for calculating a pay period. This decision is not before us.

employees who work less than 39 weeks and are, therefore, governed by § 1(B).

Section 1(B) offers partial paid vacation to those employees who have worked between 26 and 39 weeks *and* who were laid off for documented medical reasons or who have retired. Prior to 1997, Hurd allowed *all* employees who worked between 26 and 39 weeks, not just those laid off for medical reasons or who had retired, to receive partial vacation benefits. In other words, prior to 1997, Hurd voluntarily paid out vacation to more employees than it was contractually obligated under the Agreement. In 1997, Hurd decided to change its vacation policy to follow the precise terms of the Agreement. Thus, it refused to grant partial vacation benefits to any employee who had worked between 26 and 39 weeks and had been laid off for reasons other than medical problems or retirement.

In July 1997, the Union initiated a grievance challenging the new method of calculating vacation pay. The grievance was arbitrated before a mutually-agreed-upon arbitrator on March 5, 1998. The arbitrator issued his first decision on April 15, 1998. As a result of that decision, whose substance is not at issue in this case, *see supra* note 1, Hurd directed two additional questions to the arbitrator for further clarification. Hurd asked: (1) whether an employee who receives vacation pay for a week in which he does not work may count that week toward eligibility for future vacation pay; and (2) whether an employee who has been laid off for reasons other than illness count may count the layoff for purposes of eligibility for partial vacation payment. J.A. at 81 (First Clarification). The arbitrator answered the first question

in the affirmative.[3] The arbitrator answered the second question in the negative provided that the employee was laid off for an entire week as opposed to a partial week. After receiving these responses, Hurd paid out vacation benefits to several additional employees but still refused to pay vacation benefits to 74 employees who had worked between 26 and 39 weeks and who had been laid off for reasons other than legitimate illness or who had retired.

The Union again asked the arbitrator to intervene on behalf of the 74 remaining employees. The arbitrator, quoting directly from a letter from the Union, framed the issue as the following:

> The Company still disputes payment of vacation benefits to the remaining 74 grievants, all of whom had received between 26 and 39 pay checks and were otherwise qualified for vacation benefits but were laid off from 13 to 16 weeks during the year for reasons other than medical or retirement.

> The Union takes the position the remaining 74 grievants should receive one-half($\frac{1}{2}$) their full vacation benefit, plus one-twelfth ($\frac{1}{12}$) of the other one-half ($\frac{1}{2}$) of the vacation benefit for each week in excess of the 26 weeks he/she received a pay check, up to 39 weeks.

J.A. at 85 (Second Clarification). After noting that his opinion was "intended to apply explicitly to all the language of the collective bargaining agreement," J.A. at 86, and directly quoting from § 1(B), the arbitrator granted partial vacation benefits to all 74 remaining grievants who had worked between 26 and 39 weeks but who had not either been laid off for medical reasons or retired. The arbitrator then ordered Hurd to comply with his decision.

---

**3.** The arbitrator determined that any week for which an employee receives paid vacation in the current year may count toward the number of weeks worked for purposes of calculat-

ing paid vacation in the subsequent year. This decision is also not on appeal to this court.

After yet another request by Hurd to clarify the arbitrator's decision, the arbitrator issued his third clarification. J.A. at 88 (Third Clarification). According to the arbitrator, Hurd

"[A]gain stand[s] on the idea than an employee can't be paid unless they have worked 75% of the 'regularly scheduled work periods,' a concept clarified and defined by the contract and expressed by the arbitrator in the previous award. It is difficult to understand this position. The contract says that those people who have more than 13 weeks and under 26 get ½ their full vacation benefits. It says that an employee gets $\frac{1}{12}$ of the other ½ of the vacation benefit for each week in excess of 26 weeks.... To put it flatly, there is a partial payment provision in the contract which now appears to have not been obeyed."

J.A. at 88. The arbitrator again ordered Hurd to pay vacation benefits to the remaining 74 employees, noting that "I had assumed that Management could read the figures and calculate the results. They either will not or cannot understand my best use of the English language." J.A. at 89. The arbitrator continued to rely exclusively on the language of the Agreement for his award, concluding that "[t]he Union responded and mentioned theories of waiver or estoppel. When, however, the Arbitrator sees language as clear as this, no special theories are needed." J.A. at 89.

When Hurd failed to pay the benefits to the remaining 74 employees, the Union filed suit in district court seeking to compel enforcement of the arbitrator's award. Both sides filed motions for summary judgment. The district court issued an order and memorandum opinion on December 28, 1999 upholding the arbitrator's decision and granting summary judgment to the Union. In its order, the district court held that while "the arbitra-

tor appears to have misread the collective bargaining agreement ... his award represents a plausible interpretation of the contract in light of the uncontradicted evidence of past practice." J.A. at 102.

Following Hurd's motion to alter or amend the judgment, in which Hurd pointed out that the arbitrator is not allowed to rely on past practice when interpreting unambiguous language, the district court issued a second order partially granting Hurd's motion. The district court reaffirmed its grant of summary judgment but set aside its award to the Union of attorneys' fees. While the district court agreed with Hurd's interpretation of the contract and found that the arbitrator "misunderstood" the Agreement, the court felt bound to uphold the arbitrator's award because of the narrow standard of review accorded to arbitration awards. The district court determined that past practice was not a factor in the arbitrator's decision. Instead, the district court concluded that the arbitrator had relied exclusively on the language of the Agreement in making its decision. But, according to the district court, "[t]his is not a case where contract language was ignored. The ... paragraph [Section 1(B) ] was simply misapplied. In other words, the arbitrator's decision does, in fact, 'draw its essence' from the collective bargaining agreement." J.A. at 108. Hurd timely appealed from the district court's ruling.

Hurd argues to this court that the arbitrator's decision does not "draw its essence" from the Agreement and therefore should be vacated. According to Hurd, the award (1) conflicts with the express terms of the Agreement; (2) imposes additional requirements not expressly provided for in the Agreement; and (3) is not rationally supported by or derived from the Agreement. The Union does not argue that the arbitrator applied the precise lan-

guage of the Agreement, but instead urges this court to uphold the district court's decision based on well-established judicial precedent for deference to arbitration awards. The Union also points to Hurd's "past practice" as justification for the arbitrator's decision. According to the Union, the arbitrator relied upon evidence provided by the Union which demonstrated Hurd's past practice of awarding partial vacation benefits to all employees who worked 26 to 39 weeks. The arbitrator's "receipt into evidence of two (2) Union exhibits evinced the parties' mutual understanding, long-term application and intent to 'expand or otherwise deviate' from the language of the collective bargaining agreement ...." Appellee's Br. at 24. This evidence allegedly formed the basis of the arbitrator's decision.

The district court had jurisdiction over this case pursuant to § 301 of the Labor Management Relations Act, codified at 29 U.S.C. § 185(a). We have jurisdiction under 28 U.S.C. § 1291.

## II. ANALYSIS

We review a district court's grant of summary judgment in an arbitrated labor dispute de novo. *Beacon Journal Publishing Co. v. Akron Newspaper Guild, Local No. 7*, 114 F.3d 596, 599 (6th Cir. 1997). However, the scope of review is extremely limited. The Supreme Court has repeatedly held that federal courts must accord an arbitrator's decision substantial deference because it is the arbitrator's construction of the agreement, not the court's, for which the parties have bargained. *See United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 37–38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) ("Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the

meaning of the contract that they have agreed to accept."). According to the Supreme Court, "courts are not authorized to reconsider the merits of an [arbitration] award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *Misco*, 484 U.S. at 36, 108 S.Ct. 364; *see also W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber Workers of America*, 461 U.S. 757, 764, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) ("[A] federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one.").

This deferential standard is appropriate "even when the basis for the arbitrator's decision may be ambiguous." *W.R. Grace*, 461 U.S. at 764, 103 S.Ct. 2177. Because federal statutes clearly reflect a preference for arbitration over court intervention in labor disputes, courts must uphold an arbitrator's award so long as it " 'draws its essence from the collective bargaining agreement' and is not merely '[the arbitrator's] own brand of industrial justice.' " *Misco*, 484 U.S. at 36, 108 S.Ct. 364 (quoting *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)). Therefore, "[w]e review an arbitrator's decision only to determine whether the arbitrator was arguably construing or applying the contract and acting within the scope of his authority." *Beacon Journal*, 114 F.3d at 599 (internal citation omitted).

Despite this lenient standard of review, federal courts must not act as mere rubber stamps of approval on all arbitration awards. "The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award

on the ground that the arbitrator misread the contract." *Misco,* 484 U.S. at 38, 108 S.Ct. 364. Because "an arbitrator does not have unfettered discretion ... [,] when he or she departs from even arguably construing the contract, this court must vacate the award." *Beacon Journal,* 114 F.3d at 600 (internal citation omitted).

■ We have developed a four-part test to evaluate an arbitrator's award. An arbitrator's award fails to "draw its essence" from the Agreement when: "(1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on 'general considerations of fairness and equity' instead of the exact terms of the agreement." *Beacon Journal,* 114 F.3d at 600. In this case, Hurd argues that the arbitrator's award violates the first three prongs of this test. In contrast, the Union makes no mention of our four-part test, and instead refers this court to cases from myriad other circuits to support its position.

■ In order to determine whether the arbitrator's decision "draws its essence" from the Agreement, we must consider "whether the language of the contract at hand is sufficiently clear so as to deny the arbitrator the authority to interpret the agreement as he did." *Bruce Hardwood Floors v. Southern Council of Indus. Workers,* 8 F.3d 1104, 1108 (6th Cir.1993) (citation omitted). In other words, as framed by the Supreme Court in *Misco,* we must determine whether the arbitrator "ignored" or merely "misread" the language of the Agreement. *Misco,* 484 U.S.

at 38, 108 S.Ct. 364. While we are appropriately reluctant to review an arbitrator's award, in this case the arbitrator's award clearly fails to draw its essence from the contract because it conflicts with express terms of the Agreement.

If the relevant language in § 1(B) of Article 13 were susceptible to multiple interpretations and the arbitrator had selected one interpretation, clearly we would have no authority to review the arbitrator's award. Similarly, if the arbitrator had referred to the company's past practice as a means to determine the meaning of disputed words, we would defer to the arbitrator's interpretation. *Cf. Beacon Journal,* 114 F.3d at 601 ("Arbitrators commonly utilize past practice or industry customs to interpret the meaning of ambiguous, or even general, terms and clauses in a contract."). However, no specific word or phrase from the Agreement is under debate; there is no controversy about the meaning or interpretation of conflicting provisions. Thus, the question before us is not whether the arbitrator "focused on the language of the [Agreement]" but whether the arbitrator "disregarded unambiguous terms in the contract." *Lattimer–Stevens Co. v. United Steelworkers of America,* 913 F.2d 1166, 1169 (6th Cir.1990).

Article 13, § 1(B) of the Agreement clearly differentiates between those workers who have worked less than 39 weeks and have been "laid off from work as the result of a legitimate illness supported by satisfactory medical evidence" or who have "retire[d] within the eligibility period for vacation" and all other employees.[4] It is undisputed that the 74 employees at issue

---

4. The district court did "[not] find the convoluted and ungrammatical language of the contract particularly 'plain' or 'unambiguous.' " J.A. at 107. While the first sentence of § 1(B) is not artfully constructed, the clarity of the sentence is not at issue. Hurd does not argue that the arbitrator misinterpreted the first sentence. Hurd argues that the arbitrator ignored the entire sentence in its award.

in this case were neither laid off for documented medical problems nor had retired, and therefore did not fall within § 1(B)'s purview.

The district court found that the arbitrator "misapplied" but did not ignore the relevant language. The facts of this case do not bear out the district court's finding. Were we to accept the district court's distinction between misreading and ignoring contract terms, we would effectively conflate the two terms and render them synonymous. There is, however, a clear difference between actually ignoring terms in a contract and simply misreading or misinterpreting them. In this case, the arbitrator clearly ignored the first sentence of Section 1(B) when making his award. When the arbitrator's award conflicts with an express provision of the Agreement, the award fails to draw its essence from the Agreement. Therefore, the award must be vacated.

The Union strongly argues that the arbitrator's decision must be upheld because the arbitrator admitted in evidence at the hearing (and presumably, therefore, considered) two pieces of evidence which demonstrated Hurd's past practice of granting partial paid vacation to *all* employees who worked between 26 and 39 weeks. This argument fails for two reasons. First, the arbitrator himself explicitly and repeatedly affirmed that he was relying exclusively on the language of the Agreement, as opposed to past practice in his decision. For example, in his Second Clarification, he stated: "Our [sic] opinions at all times were intended to apply explicitly to all the language of the collective bargaining agreement appearing in Article 13. We [sic] noted then and now section 1(B)." J.A. at 86. In his Third Clarification, the arbitrator stated: "Management seems now to continue to contend that anyone with less than 39 weeks ... gets no pay. Somehow that thought ignores Section (B)." J.A. at 88. Clearly, the arbitrator felt that the language of the Agreement supported his position.

Second, an arbitrator may not consider past practice when the terms of the contract are clear. This circuit has held that "past practice or custom should not be used to interpret or give meaning to a provision or clause of the collective bargaining agreement that is clear and unambiguous." *Beacon Journal*, 114 F.3d at 601. In an unpublished decision with similar facts, this court found that where a collective bargaining agreement's terms are clear but the management has engaged in a contrary practice for a number of years, the words of the Agreement must be enforced. *See Omnisource Corp. v. United Steelworkers of America*, No. 98–3603, 1999 WL 552600, at *2, 187 F.3d 637 (6th Cir. July 26, 1999). Therefore, whether or not the arbitrator in this case considered past practice, the arbitrator's decision conflicts with the express terms of the agreement and must be overturned.

## III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment and VACATE the arbitrator's award.