NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0424n.06

Case No. 16-3893

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

WILLIAM FARLEY,

    Petitioner-Appellant,

v.

EATON CORPORATION,

    Respondent-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
Jul 20, 2017
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

---

**Before:  MERRITT, BATCHELDER, and CLAY, Circuit Judges.**

**MERRITT, Circuit Judge.**  This is an appeal from the district court's order denying petitioner William Farley's motion to vacate an arbitration award and granting respondent Eaton Corporation's motion for confirmation of the arbitration award arising from Farley's agreement to indemnify Eaton for environmental remediation expenses in connection with the sale of a plant in Bethel, Connecticut.  The parties dispute the proper interpretation of indemnification language in the contracts between Farley, or his companies, and Eaton concerning the Bethel property.  The indemnification provision provides:

> Liabilities, obligations, fines, clean-up costs or penalties, with respect to the premises and matters set forth below, resulting from non-compliance prior to August 8, 1986 by [sellers], with any applicable laws, regulations, orders, or other requirements of any governmental authorities existing on or before August 8, 1986:

> Bethel Connecticut Plant: on-site and off-site soil and groundwater contamination resulting from the use of on-site pits to treat and dispose of waste solvent.

Farley argues that the arbitrator exceeded his power in finding for Eaton because no governmental order regarding groundwater contamination had been issued on or before August 8, 1986, and the indemnification clause was therefore not triggered. The arbitrator found that the contract language covered noncompliance predating the sale, and that the parties intended that something other than a specific governmental order would suffice to require indemnification by Farley to Eaton. An arbitrator's construction of contract language is entitled to great deference and Farley has not presented evidence that the arbitrator's award did not "draw its essence" from the contract. We agree with the district court's opinion, and affirm its judgment.

## I.

The underlying facts are basically undisputed. Eaton acquired a manufacturing plant from Consolidated Controls Corporation, a subsidiary of Condec Corporation (later known as VBQ), through an Asset Purchase and Sale Agreement and a Stock Purchase Agreement on August 8, 1986. Consolidated Controls was a manufacturer of instruments, controls, and systems used in aerospace, naval, and stationary power plant applications. Farley was not personally a party to those agreements, but he held a controlling interest in both Condec and Consolidated Controls. The property contained an unlined lagoon where untreated waste solvents and paint had been disposed of for years, a fact known to all parties at the time of the sale. It is undisputed that the Connecticut Department of Environmental Protection knew of the contamination at the site well before the sale of the property in 1986. The Department issued a "Letter of Deficiency" in 1982 noting that "solvents were dumped into this pit." It then issued a "Notice of Violation" in 1984 directing that "soil samples must be collected and analyzed . . . for the presence of volatile organic contaminants that may remain from the past disposal activities."

The Department also filed a complaint against Consolidated Controls in May 1986 that was pending at the time of the sale. The complaint alleges mishandling of hazardous waste at the plant, but it does not specifically mention groundwater contamination or remediation.

The 1986 Asset Purchase and Sale Agreement included a provision where the sellers, Condec and Consolidated Controls, would indemnify the buyer, Eaton Corporation, for costs of cleaning up environmental contamination on the transferred property. Sellers agreed to indemnify Eaton

> for any liabilities, obligations, fines, clean–up costs or penalties . . . resulting from non-compliance prior to Closing by Sellers with respect to any premises related to [Consolidated Controls Corporation or Condec], with any applicable laws, regulations, orders or other requirements of governmental authorities, relating to the control of surface or groundwater pollution, hazardous substances or waste (or the disposal thereof), or air quality and emission standards, or otherwise relating to the protection of the environment.

1986 Agreement § 11.1(C). The 1986 Agreement also attached Schedule 5.5, entitled "Operation of Purchased Assets Which Violates, or Allegedly Violates, Applicable Laws, Regulations, Orders or Other Requirements of Government Authorities," which set forth all matters that were not in compliance with applicable laws at the time of the sale. The Schedule also listed pending litigation against the sellers, including a copy of the May 6, 1986, complaint by the Department of Environmental Protection concerning the mishandling of hazardous waste at the site. Also included in the Schedule was a document whereby the sellers expressly acknowledged the contamination at the time of the sale. Under Connecticut law, the seller was required to certify to the buyer on a "Form III" certification that the property was free from known contamination at the time of the sale, or to give the reason why such a negative declaration could not be given. Connecticut Transfer Act, Pub. Act 85-568. The sellers stated

that they were "unable to submit a negative declaration" due to the contamination from volatile organics present on the property:

> I certify that, to the extent necessary to minimize or mitigate a threat to human health or the environment, I shall contain, remove or otherwise mitigate the effects of any discharge, spillage, uncontrolled loss, seepage, or filtration of hazardous waste at the site . . . in accordance with procedures and a time schedule approved by the Commissioner of Environmental Protection pursuant to an order, stipulated judgment, or consent agreement.

Form III Certification at 2.

In 1987, about six months after the sale of the property to Eaton, the Connecticut Department of Environmental Protection issued an order to Eaton, now the owner of the property, identifying the lagoon as a "condition which can reasonably be expected to create a source of pollution of the waters of the State . . . ." and directing it to "[i]nvestigate the extent and degree of ground water, surface water and soil contamination" resulting from the facility's lagoon and to "[t]ake necessary remedial actions to minimize or eliminate the contamination resulting from such practices." Department of Environmental Protection Order No. HM-398 (Feb. 18, 1987). Eaton and the Department eventually agreed upon a "pump and treat" system, which became operational in 1992. Representatives of the sellers, including Farley, were kept apprised of the negotiations between Eaton and the Department. The 1987 order from the Department is still in effect today and Eaton must continue to operate and maintain the pump and treat system. In 1991, pursuant to the indemnification terms of the 1986 Asset Purchase and Sale Agreement, Eaton began seeking, and receiving, reimbursement for the treatment system from the sellers, companies controlled by Farley.

In 1996, Condec's successor, VBQ, filed for bankruptcy. Due to the bankruptcy, Farley assumed personal liability for the company's indemnification obligations under the 1986 Agreement by entering into with Eaton the Amended and Restated Payment Procedures

Agreement, the contract upon which the arbitration arose.[1]  The 1998 Agreement provides in

relevant part:

> Eaton has the right to make claims . . . under this Agreement if: Eaton has incurred or suffered losses, liabilities, damages, costs, or expenses (collectively "Environmental Liabilities") equal to the amount of the claim resulting from (1) the environmental matters described on Exhibit A hereto. . . .

Section 1.1.1.  Exhibit A states in relevant part (emphasis added):

> Liabilities, obligations, fines, clean-up costs or penalties, with respect to the premises and matters set forth below, resulting from non-compliance prior to August 8, 1986 by CCC or VBQ [Condec's successor], with any applicable laws, regulations, orders, or other requirements of any governmental authorities existing on or before August 8, 1986:
>
> *Bethel Connecticut Plant: on-site and off-site soil and groundwater contamination resulting from the use of on-site pits to treat and dispose of waste solvent.*

Because the 1998 Agreement imposed certain obligations on Farley personally, the

1998 Agreement allowed Farley to obtain a $10 million insurance policy through AIG to secure

his obligations under the Agreement, and the Agreement established the terms under which

Eaton may receive payment directly from AIG.  The AIG policy provides: "The Insurer hereby

agrees to  . . . pay or reimburse Eaton directly for any Claim . . . made directly by Eaton under

Section 1.1, Section 2.1.1. or Exhibit A of the [Amended and Restated] Payment Procedures

Agreement . . . ."  Policy § 1.  Between 1991 and 2003, Farley or his companies paid Eaton over

$2 million in 13 separate payments.  *See* Eaton's Br. at 9.

Between 2003 and 2010, the parties, including Farley or his representatives, continued to

correspond about remediation at the site.  No payments were made by Farley during that time,

and it appears that Eaton made no requests for reimbursement.  On November 19, 2010, Eaton

---

[1] The 1998 Agreement provided that if informal dispute resolution fails, the "dispute shall be resolved by arbitration," and the arbitrator's award "shall establish if, and to the extent, Eaton was "Entitled to Receive Payment' for the disputed payment(s) . . . ."  1998 Agreement at § 6.5.

certified that under the 1998 Agreement, it was entitled to receive payment in the amount of $506,460.93 from Farley for environmental costs incurred from 2003 through 2010, including costs for the pump and treat groundwater remediation system. Farley failed to make the requested payment, and Farley did not timely invoke dispute resolution in accordance with the 1998 Agreement. Eaton submitted the claim, as authorized under the 1998 Agreement, directly to the insurance company, AIG, pursuant to the policy Farley had purchased to guarantee his obligations under the 1998 Agreement with Eaton. AIG made two reimbursements to Eaton in the approximate amounts of $440,000 and $53,000, sums Farley now claims were wrongfully paid. A little over three years later, on January 24, 2014, Eaton again certified in accordance with the 1998 Agreement that it was entitled to receive payment from Farley for environmental costs, including further costs for the groundwater remediation system, incurred from November 2010 through December 2013 in the amount of $175,838.48. Farley again failed to pay.

On February 18, 2014, Farley's counsel timely issued a notice of dispute resolution under the 1998 Agreement with respect to Eaton's claim made in January 2014 for $175,838.48. After informal dispute resolution failed, the claim proceeded to arbitration in Chicago, Illinois, before Arbitrator Michael Pope. Farley added a new claim challenging the payment of $506,460.93 made by AIG to Eaton in 2010. Eaton filed a counterclaim. After a four-day hearing, the Arbitrator awarded Eaton $175,838.48 on its counterclaim, $10,265.18 in statutory interest, and $902,106.64 in prevailing party attorney fees and costs for a total of $1,088,210.30. The arbitrator also confirmed the payments made by AIG directly to Eaton.

The parties sought confirmation or vacation of the arbitrator's award in the district court pursuant to the Federal Arbitration Act, 9 U.S.C. § 9. The district court denied Farley's motion to vacate the award and granted Eaton's motion to confirm the award. *Farley v. Eaton Corp.*,

No. 1:16 CV 690, 2016 WL 3619306 (N.D. Ohio July 6, 2016). After emphasizing the deference

that must be given to the arbitrator's opinion under the Federal Arbitration Act, the district court

noted that the arbitrator did not "ignore" the language in the 1998 Agreement and had not gone

beyond the intent reflected in the contract language. *Id.* at *4. This appeal followed.

## II.

Under the Federal Arbitration Act, once an arbitration award is made, any party to the

arbitration may move to confirm the award. 9 U.S.C. § 9. The court "must grant the motion

unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11." *Id*.

A district court may make an order vacating the award where the arbitrator exceeds his powers.

9 U.S.C. § 10(a)(4). These two sections provide the "exclusive regime[ ]" for federal court

review of an arbitrator's award. *Grain v. Trinity Health, Mercy Health Servs. Inc.*, 551 F.3d 374,

378 (6th Cir. 2008) (quoting *Hall St. Assocs. v. Mattel, Inc.*, 552 U.S. 576, 590 (2008)). The

district court stated the standard of review appropriately and correctly, relying on the relevant

Supreme Court and Sixth Circuit authority:

> The Federal Arbitration Act (FAA) has a strong presumption in favor of confirming an arbitration award, so a court's review of an arbitrator's decision is exceedingly narrow, "one of the narrowest standards of judicial review in all of American jurisprudence." *UHL v. Komatsu Forklift Co.*, 512 F.3d 294, 305 (6th Cir. 2008) (quoting *Lottimer-Stevens Co. v. United Steelworkers*, 913 F.2d 1166, 1169 (6th Cir. 1990)). "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. . . . [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, [the fact] that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union, AFL CIO v. Misco, Inc.*, 484 U.S. 29, 37-38 (1987); *Stonebridge Equity v. China Auto. Sys., Inc.*, 520 F. App'x 331, 337 (6th Cir. 2013)(internal quotation marks and citations omitted)("So long as the arbitrator was even arguably construing or applying the contract, the award cannot be overturned.").

2016 WL 3619306, at *2. Review of the arbitrator's decision is therefore extremely deferential. *Beacon Journal Publ'g Co. v. Akron Newspaper Guild, Local No.7*, 114 F.3d 596, 599 (6th Cir. 1997). Farley stresses that, while deferential, this court's review is "not toothless" when an arbitrator's award disregards the explicit provisions of the contract. An award must be vacated if it is based upon "general considerations of fairness and equity rather than the exact terms of the agreement." *Id.* at 600.

The question presented is one of contract interpretation, specifically the meaning of the indemnity provision in Exhibit A to the 1998 Amended and Restated Payment and Procedures Agreement, which sets out the terms under which Farley would personally indemnify Eaton. Farley contends that the arbitrator improperly looked beyond the unambiguous language of the 1998 Agreement, which stated that reimbursement was required only for expenses

> resulting from non-compliance prior to August 8, 1986 [by the selling companies], with any applicable laws, regulations, orders, or other requirements of any governmental authorities existing on or before August 8, 1986:

> Bethel Connecticut Plant: on-site and off-site soil and groundwater contamination resulting from the use of on-site pits to treat and dispose of waste solvent.

Farley's position is that the arbitrator "disregarded" or "rewrote" the contract terms because the Connecticut Department of Environmental Protection did not issue its remediation order concerning groundwater contamination until February 1987, six months after August 8, 1986, and thus there were no "applicable laws, regulations, orders, or other requirements of any governmental authorities existing on or before August 8, 1986." Farley concedes that the "requirement" need not necessarily be in the form of an "order," but he maintains that the 1982 Letter of Deficiency and the 1984 Notice of Violation do not qualify as government requirements to clean up the groundwater and that no other requirement existed.

Farley maintains, therefore, that the arbitrator looked beyond the plain language of the Agreement, wrongly attempting to "construe the intent of the parties," instead of interpreting the agreement as written. To support his allegation, Farley points to language in the arbitrator's opinion where he states that applying the 1998 Agreement as written was "hard to accept" and questions "[w]hy would a buyer agree to indemnification of a known polluted site only if a government order had already issued?" Arbitrator's Op. at 6.

The arbitrator acknowledged that Farley's argument was intellectually honest, but concluded that the intent of the parties in the 1998 Agreement was to indemnify Eaton for cleanup of preexisting contamination at the Bethel site. The arbitrator considered and addressed the language in the contract concerning Farley's argument requiring a governmental order to be in place as of August 6, 1986 in order to trigger the indemnification term, but he determined that "the language of Exhibit A [to the Amended and Restated Payment Procedures Agreement] does not require that conclusion." *Id*. He opined:

> The reference to "any applicable laws, regulations, orders . . . existing on or before August 6, 1986, might support [Farley's] argument, but by the additional terms "or other requirements of any governmental authorities. . ."[,] the parties clearly intended something other than a specific order or regulation would be sufficient.

*Id*.

In construing the "or other requirements of any governmental authorities" language, the arbitrator looked to the intent of the parties. One of the documents the arbitrator relied on was "Form III," the certification required by the State of Connecticut when property is transferred. By signing Form III, the sellers acknowledged at the closing on August 6, 1986, that they could not certify that the property was in compliance with governmental laws and regulations in effect at the time. The Form also required the seller to mitigate the effects of any "seepage or

discharge of hazardous waste" at the site. By signing this document, the sellers, companies controlled by Farley, acknowledged contamination at the site at the time of the sale and the requirement to mitigate it. Farley himself conceded during his hearing testimony that, "I believe we [his companies] agreed that there was noncompliance in '86." Arbitration Hr'g Tr. at 417. Farley attempts to avoid this concession by arguing that the representation was made by his companies, not by him personally, and that he was not a party to the 1986 Agreement, so any intent derived from Form III cannot be imputed to him.

Even if Farley could avoid the imputation to him personally, which is unlikely as he held a controlling interest in the companies making the representation, Farley conceded in the Amended and Restated Payment Procedures Agreement in 1998 that the remediation costs at the site were subject to indemnification. The 1998 Agreement, to which Farley is a party, includes almost identical indemnification language to the 1986 Agreement and adds "Exhibit A," which specifically references groundwater contamination at the Bethel site ("Bethel Connecticut Plant: on-site and off-site soil and groundwater contamination resulting from the use of on-site pits to treat and dispose of waste solvent."). Given the specific language in Exhibit A, and the fact that the 1987 clean-up order issued by the Connecticut Department of Environmental Protection had been in effect for 11 years at the time Farley entered into the 1998 Agreement with Eaton, the arbitrator concluded that it could not have been Farley's intent in 1998 not to indemnify Eaton for groundwater remediation at the Bethel site, even in the absence of a specific governmental order predating August 1986. The arbitrator also pointed to language in the AIG policy Farley procured in 1998 that specifically referenced coverage for cleanup costs to include "the current remediation at the Bethel site."

The arbitrator also considered the parties' past practices and conduct in construing the 1998 Agreement, including the previous reimbursements to Eaton by Farley or his companies. Farley, his companies or his insurer reimbursed Eaton in excess of $2.5 million. Farley argues that this reliance is improper under the language in the 1998 Agreement stating that "No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of such provision at any time in the future." 1998 Agreement at § 7.1. Although it is generally true that clear contract language prevails over inconsistent past practice, it was not improper for the arbitrator to consider these admissions of liability when attempting to determine the parties' intentions when the contract language is open to interpretation, as it is here. *See Int'l Paper Co. v. United Paperworkers Int'l Union*, 215 F.3d 815, 817 (8th Cir. 2000) ("Although an arbitrator may look to outside sources to aid in interpreting . . . , he must [be] constru[ing] the contract . . . , not amend[ing] it.") (citing *Keebler Co. v. Milk Drivers and Dairy Emps. Union, Local No. 471*, 80 F.3d 284, 288 (8th Cir. 1996)). The arbitrator has the authority, as a function of interpreting contract language, to consider whether a past practice reflects the mutual intent of the parties. The arbitrator may not ignore the plain language of the contract, but the parties authorized the arbitrator to give meaning to the language of the agreement, and a court should not reject an award on the ground that the arbitrator misread the contract. So long as the arbitrator is arguably construing or applying the contract and acting within the scope of his authority, even the fact that a court is convinced he committed serious error does not suffice to overturn his decision. *United Paperworkers Int'l Union*, 484 U.S. at 38; *see also Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001).

In sum, Farley's arguments amount to an equitable argument against requiring him to give Eaton a "blank check" to pay for unknowable cleanup costs far into the future. Farley did

not raise any argument before the arbitrator that his liability should be limited only to what was "reasonably foreseeable" in 1998, or some other equitable argument that would support terminating his liability at some point.

Given the extreme deference we must give the arbitrator's decision, we conclude that the arbitrator did not exceed his power in interpreting the indemnification clause. For the foregoing reasons, the judgment of the district court is affirmed.