RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0081P (6th Cir.)
File Name: 03a0081p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

EISENMANN CORPORATION,
        *Plaintiff-Appellee,*

            *v.*                                  No. 01-3019

SHEET METAL WORKERS
INTERNATIONAL ASSOCIATION
LOCAL NO. 24, AFL-CIO,
        *Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 99-00164—Susan J. Dlott, District Judge.

Argued: April 23, 2002

Decided and Filed: March 19, 2003

Before: KRUPANSKY and BOGGS, Circuit Judges;
LAWSON, District Judge.[*]

---

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

_____

**COUNSEL**

**ARGUED:** Michael T. Anderson, DAVIS, COWELL & BOWE, San Francisco, California, for Appellant. Alan S. King, GARDNER, CARTON & DOUGLAS, Chicago, Illinois, for Appellee. **ON BRIEF:** Michael T. Anderson, Richard G. McCracken, DAVIS, COWELL & BOWE, San Francisco, California, Jerry A. Spicer, SNYDER, RAKAY & SPICER, Dayton, Ohio, for Appellant. Alan S. King, GARDNER, CARTON & DOUGLAS, Chicago, Illinois, James A. Mills, DENLINGER, ROSENTHAL & GREENBERG CO., Cincinnati, Ohio, for Appellee.

_____

**OPINION**
_____

DAVID M. LAWSON, District Judge. In 1998, an arbitration panel awarded the defendant union local $1.6 million against the plaintiff, the general contractor for a General Motors plant renovation project, because the contractor violated the terms of a Project Labor Agreement that General Motors made with seventeen unions on the project, limiting dealings to contractors who pay their workers wages equal to union scale. In the ensuing litigation challenging and seeking confirmation of the award, the district court vacated the arbitration award because it found that it violated public policy by extending a collective bargaining agreement to workers who had not chosen the union as their bargaining representative, in violation of Sections 8(f) and 9(a) of the National Labor Relations Act. Our review discloses no such policy violation; we find that the effect of the arbitration award is to enforce the terms of the Project Labor Agreement, which required contractors and subcontractors who participated in construction activities on the project to abide by union standards for all workers

C.

Finally, Eisenmann contends that the $1.6 million arbitration award did not "derive its essence" from the labor agreements, mainly because there was insufficient evidence before the LJAB from which to calculate damages. Moreover, Eisenmann insists that since a great deal of the off-site work was performed at its own plant, the work was not actually "subcontracted" so as to violate the Agreement.

Because the district court found that the arbitration award violated federal labor policy, it never reached this issue. We believe that it is an issue which should be decided by the district court in the first instance, under the appropriate standards of review of arbitral decisions, discussed above. *See Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 554 (6th Cir. 1998).

III.

Because we find that the arbitration award in this case does not violate any of the applicable provisions of the National Labor Relations Act, we conclude that the district court's contrary conclusion is erroneous. We therefore **REVERSE** the judgment of the district court and **REMAND** this case for further proceedings consistent with this opinion.

connected to the project, both on and off the job site. We therefore reverse the judgment of the district court.

I.

The dispute in this case arises from the enforcement of a provision of a local collective bargaining agreement between the defendant, Sheet Metal Workers International Association Local 24, AFL-CIO ("Local 24"), and the Sheet Metal & Roofing Contractors' Association of the Miami Valley Ohio ("Local Agreement") against the plaintiff in this case, Eisenmann Corporation, who neither signed the local agreement nor was a member of the Association. The provision obligated contractors who outsourced work on a project subject to the local agreement to deal only with "fabricators who pay their employees engaged in such fabrication not less than the prevailing wage for comparable sheet metal fabrication, as established under the provisions of" the Local Agreement. Local Agreement, art. II, § 2.

In 1997, General Motors Corporation embarked upon a project to revamp its paint facilities at its Moraine, Ohio assembly plant, which manufactures sport utility vehicles. Before work on the project began, GM entered into a Project Labor Agreement with seventeen local unions who were members of the Dayton Building & Construction Trades Counsel, including Sheet Metal Workers Local 24. In the Project Labor Agreement, the unions promised to refrain from all job actions, such as strikes, slow-downs and other work stoppages, and further to refuse to honor any picket lines on the job site. In return, GM agreed to "contract with contractors and subcontractors who will employ individuals to perform construction work within the trade work under the jurisdiction of the Union." Project Labor Agreement, art. II. GM also agreed that the "terms and conditions and rates of pay of the applicable local and national recognized Collective Bargaining Agreements shall apply where there is no conflict with this Agreement." *Id.*, art I. Local 24's Local Agreement, including Article II, Section 2, quoted above, was thus

incorporated into the Project Labor Agreement. Finally, the signatories agreed to submit their disputes to binding arbitration. In the case of disputes involving the sheet metal workers, arbitration was to be conducted by a Local Joint Adjustment Board (LJAB) composed of equal numbers of representatives of the Union and the Employers' Association.

Eisenmann, which engineers and installs paint finishing systems, became the supervising contractor on the project on May 5, 1997. It received a purchase order from GM dated March 27, 1997 which incorporated a memorandum dated March 26, 1997. That memorandum, in turn, stated that "[t]he local labor agreement" was among the items that "shall be considered part of the contract." J.A. at 169-70. Max Herholz, Eisenmann's president, acknowledged in an affidavit that Eisenmann received a copy of the Project Labor Agreement before commencing work on the project.

From the beginning of its operations at the Moraine site, which started on June 8, 1997, Eisenmann had few of its own employees working on the project, choosing instead to subcontract all the work done at the job site to unionized subcontractors. Eisenmann's own employees at the job site served in managerial and supervisory capacities. Local 24 members performed the on-site sheet metal work.

However, a significant portion of the fabrication work was done off-site: Eisenmann fabricated industrial oven modules and oven heater boxes at its Crystal Lake, Illinois facility, and contracted with IMF, Inc., a Tennessee-based company, to fabricate pretreatment and rinse housing modules. All of these units were to be installed at the Moraine job site. None of the workers involved in this off-site work were union members. Moreover, IMF employees earn $9 an hour on average, whereas the base wage for a Local 24 sheet metal worker is $20.73.

When Local 24 representatives learned of Eisenmann's outsourcing the sheet metal fabrication work, they complained

emphasized the important goal of maintaining industrial peace, the technical rules of commercial contract law need not be strictly applied to labor contracts." *Id.*

The evidence before the district court quite compellingly points to the conclusion that Eisenmann intended to be bound by the Project Labor Agreement which GM had negotiated with the several union signatories, including Local 24. GM's purchase order to Eisenmann stated that the Labor Agreement was considered part of the contract, and Eisenmann's president acknowledged that he received the Project Labor Agreement before Eisenmann commenced work on the project. Because the Agreement contained significant terms ensuring industrial peace throughout the project, it is unlikely that GM would have awarded the contract to Eisenmann if the general contractor had given any indication that it intended to repudiate the Project Labor Agreement. As general contractor, Eisenmann benefitted from the no-strike, no-work-slow-down provisions of the Agreement, and it admits that it honored the "spirit" of the agreement "so as not to cause any disruption in our relationship with GM." Aff. of Max Herholz, ¶ 17. Indeed, had it acted otherwise, Eisenmann would have been in breach of its agreement with GM.

Nor are the arbitration provisions in the Project Labor Agreement any less binding because the subject matter of the dispute included the application of union standards (i.e., standards for wages and benefits) to off-site workers. As noted above, the provisions of the labor agreements that formed the foundation of the dispute were intended to create job security for on-site workers. The subject matter of the grievance was Eisenmann's on-site conduct: bringing to the project site sheet metal products that were prefabricated by workers who were not paid union scale wages.

The district court's assumption that Eisenmann was bound by the arbitration provisions of the Project Labor Agreement is not undermined by a disputed issue of material fact, according to our review of the lower court record.

covered by the agreement, not just employees of the general contractor. *See Bermuda Container Line, Ltd. v. Int'l Longshoremen's Ass'n*, 192 F.3d 250, 256-57 (2d Cir. 1999). The sheet metal workers within Local 24's jurisdiction on the GM Moraine project were entitled to the protection which the Project Labor Agreement provides, including the work preservation provisions, despite the fact that they may not have been directly employed by Eisenmann. We find that the dominant motive and the primary effect of Article II, Section 2 was the preservation of on-site work for sheet metal workers on the GM Moraine project. That section does not constitute a "hot cargo" agreement.

We hold, therefore, that the arbitration award did not violate Section 9(a) or 8(e) of the National Labor Relations Act, nor did it contravene any well-defined and dominant labor policy. The lower court ought not to have vacated the arbitration award on these grounds.

### B.

Eisenmann did not participate in the arbitration proceedings because it contended that it never agreed to submit the dispute to arbitration. It now maintains that it was not bound by the arbitration provisions incorporated into the Project Labor Agreement, particularly with respect to disputes relating to off-site work, because it never manifested an intent to be bound by the Agreement. The district court did not deal extensively with this argument, but rather "assumed" that "Eisenmann was a party to, and therefore bound by, the agreements." J.A. at 141.

"[T]he existence of a labor contract 'does not depend on its reduction in writing'; it can be shown by conduct manifesting an intention to abide by agreed-upon terms." *Int'l Bhd. of Boilermakers Local 1603 v. Transue & Williams Corp.*, 879 F.2d 1388, 1392 (6th Cir. 1989) (quoting *Bobbie Brooks, Inc. v. Int'l Ladies' Garment Workers' Union*, 835 F.2d 1164, 1168 (6th Cir. 1987)). "Because federal labor policy has

to Eisenmann, arguing that the Project Labor Agreement required that the off-site work be performed by unionized workers. Eisenmann contends that around this time a local branch of the Sheet Metal Workers Union handed out recruitment literature at its Crystal Lake facility in an attempt to organize its workers. Furthermore, Eisenmann alleges that at no time prior to arbitration did Local 24's complaints include the issue of off-site workers not being paid union scale wages. Nonetheless, when Eisenmann and Local 24 were unable to resolve their differences, the Union filed a grievance on February 25, 1998 before the Local Joint Adjustment Board contending that Eisenmann had failed to abide by Article II, Section, 2 of the Local Agreement, *i.e.*, to ensure that all of the work was done by individuals receiving the prevailing wage.

Eisenmann refused to participate in the arbitration proceedings, maintaining instead in a letter by its counsel dated July 7, 1998 that the board lacked jurisdiction over the matter as Eisenmann was not a signatory to the various labor agreements which required arbitration. The hearing proceeded on July 9, 1998, after a one-day delay from the scheduled date, with only Local 24 presenting evidence. On July 24, 1998, the LJAB ruled in Local 24's favor, finding that

Eisenmann Corporation violated Article I and II of the Project Agreement and Article I, Section 1 and Article II, Section 2 of the Local No. 24 Labor Agreement. The disputed work performed and subcontracted by Eisenmann was within the scope of work covered by the bargaining agreements and was work regularly, customarily and traditionally performed by bargaining unit employees and employers, and neither Eisenmann nor its subcontractor, IMF, paid the prevailing wage for the performance of such work.

J.A. at 64. The LJAB assessed damages at $1.6 million, presumably based on evidence of a purported pre-arbitration

conversation between Herholz and union representatives in which Herholz allegedly said that this was the amount of off-site work involved in the project. Herholz denied that he made the statement.

On August 20, 1998, Eisenmann appealed the arbitration award to the National Joint Adjustment Board. Eisenmann made clear, however, that it was not waiving its claim that the arbitration panel lacked jurisdiction over the matter. On November 19, 1998, the NJAB affirmed. It held:

> After careful consideration of the evidence presented, the panelists agreed that the Eisenmann Corporation was or should have been aware of the project agreement which referenced the Local 24 Collective Bargaining Agreement. The panelists find a violation has occurred and find no reason to modify the LJAB decision. We further find that all damages ($1,600,000.00) should be paid to Local 24 Joint Education & Training Fund.

J.A. at 76.

Unsatisfied with this result, Eisenmann commenced an action in the district court challenging the arbitration award, which, it contended, should be vacated because "(a) the arbitration panel lacked jurisdiction over Eisenmann, (b) enforcement of the award would be illegal under the National Labor Relations Act and the Sherman Act, and against public policy, and (c) the award is not supported by the evidence presented at the hearing and does not 'draw its essence' from the relevant agreements." Compl. ¶ 2. Local 24 counterclaimed seeking confirmation of the award. The parties' cross-motions for summary judgment were referred to a magistrate judge, who recommended that the award be vacated because of his belief that the arbitration award was rendered in "manifest disregard of the law." The district court adopted the recommendation. The court reasoned that although the relationship between Local 24 and Eisenmann constituted a valid "prehire" agreement under Section 8(f) of

organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work.

29 U.S.C. § 158(e) (emphasis added).

The Supreme Court has held that although the literal language of this section does not distinguish between primary and secondary effects, in enacting Section 8(e), "Congress intended to reach only agreements with secondary objectives." *NLRB v. Int'l Longshoremen's Association, AFL-CIO*, 447 U.S. 490, 504 (1980). "A secondary boycott . . . is designed to coerce third-party customers or suppliers to withhold business relations from a primary employer. The distinction between primary and secondary activity focuses on intent." *Becker Elec. Co. v. Int'l Bhd. of Elec. Workers*, 927 F.2d 895, 897-98 (6th Cir. 1991) (*per curiam*). Thus, where the principal effect of the provision is to discourage employers from outsourcing work normally performed by employees protected by the agreement, rather than coercing third parties to unionize, for example, Section 8(e) is not violated. "Whether an agreement is a lawful work preservation agreement depends on whether, under all the surrounding circumstances, the Union's objective was preservation of work for bargaining unit employees, or whether the agreement was tactically calculated to satisfy union objectives elsewhere. The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-a-vis* his own employees." *Longshoremen*, 447 U.S. at 504 (quoting *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 644-45 (1967)).

Here, Eisenmann argues that the primary objective of Article II, Section 2 cannot be the preservation of work performed by its on-site employees, since its on-site personnel consisted only of managers and supervisors, not sheet metal workers. However, this argument ignores the principle that a project labor agreement may protect work for any worker

Eisenmann believes that work preservation clauses such as the one now before the court are only valid in the context of Section 9(a) bargaining relationships, since Section 8(f) relationships may not be extended off-site. It is true that an effect of a union standards clause is to limit the range of off-site contractors with whom a general contractor may deal, but not because of the union status of those subcontractors. Rather, the main purpose of work preservation clauses is to keep the work on-site by removing economic incentives for the general contractor to send it elsewhere. Thus, "under an existing 8(f) relationship, the union party to the 8(f) contract is the lawful representative of the employees covered by the contract. As their representative such union has an interest in restricting subcontracting in order to protect continuity of work and fringe benefits for the employees and to insure more stable and harmonious jobsite relations to the same extent a 9(a) representative has." *Los Angeles Bldg. & Constr. Trades Council.*, 239 N.L.R.B. 264, 270 (1978).

Eisenmann contends, however, that by enforcing Article II, Section 2 of the Agreement, which prevented dealings with off-site companies that did not pay union scale wages, the LJAB and the NJAB ran afoul of Section 8(e) of the Act, which prohibits "hot cargo" agreements. Section 8(e) states:

(e) Enforceability of contract or agreement to boycott any other employer; exception

*It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person*, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforc[e]able and void: Provided, that nothing in this subsection shall apply to an agreement between a labor

the NLRA, the arbitrators unlawfully extended the agreement "well beyond its permissible limits by applying it to employees who performed solely off-site work." J.A. at 154. As a consequence, the court concluded, the award violated "an explicit public policy that is well defined and dominant," *id.*, that is, that except in carefully circumscribed circumstances, union representation may not be imposed on a workforce absent majority support. The lower court vacated the arbitration award. This appeal followed.

## II.

By its very nature, a summary judgment does not involve the determination of disputed questions of fact, but is confined to purely legal issues. Fed. R. Civ. P. 56(c) (summary judgment may be granted only if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We review the district court's legal conclusions *de novo*. *Lautermilch v. Findlay City Sch.*, 314 F.3d 271, 274 (6th Cir. 2003); *Int'l Union, UAW v. Dana Corp.*, 278 F.3d 548, 554 (6th Cir. 2002).

The standard of review for the decisions of arbitrators, on the other hand, is highly deferential. *See Beacon Journal Publ'g Co. v. Akron Newspaper Guild, Local No. 7*, 114 F.3d 596, 599 (6th Cir. 1997) ("The Supreme Court has made clear . . . that courts must accord an arbitrator's decision substantial deference because it is the arbitrator's construction of the agreement, not the court's construction, to which the parties have agreed."). The Supreme Court has tightly circumscribed the authority of federal courts to overturn arbitration awards, and has consistently held that they may not do so "[a]s long as the arbitrator's award draws its essence from the collective bargaining agreement, and is not merely his own brand of industrial justice." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987) (internal quotations omitted). "[I]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his

authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (internal quotations omitted).

We have identified four ways by which an arbitrator may stray from the "essence" of the collective bargaining agreement: an arbitration award may be declared invalid and vacated if "(1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on general considerations of fairness and equity instead of the exact terms of the agreement." *Int'l Union*, 278 F.3d at 554 (quoting *MidMichigan Reg'l Med. Ctr.-Clare v. Prof'l Employees Div. of Local 79*, 183 F.3d 497, 502 (6th Cir. 1999)). In addition, courts may upset an arbitration award if it is rendered in "manifest disregard of the law," *see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995), or if it is contrary to a well-defined and dominant public policy, *see Eastern Associated Coal Corp. v. United Mine Workers of Amer., Dist. 17*, 531 U.S. 57, 62 (2000). Finally, certain "gateway procedural disputes," such as questions of arbitrability, including whether parties have agreed to submit their dispute to arbitration, are reserved for the courts to decide. *See Howsam v. Dean Witter Reynolds, Inc.*, 123 S. Ct. 588, 593 (2002).

On appeal, Eisenmann argues that the arbitration award was properly vacated for three reasons. First, it contends, as the lower court held, that the award was made in violation of explicit labor policy because it extended a Section 8(f) prehire agreement to off-site workers, contrary to the dominant policy of reserving the privilege of union representation to those bargaining entities who have garnered majority support. Second, Eisenmann argues that it was not bound by the arbitration provisions incorporated into the Project Labor Agreement, particularly with respect to disputes relating to off-site work, because it never manifested an intent to be

enforcing a legitimate disincentive to outsource work within Local 24's jurisdiction.

The import of Article II, Section 2 is that a primary employer may not subcontract work to another company unless that company's workers enjoy the same or greater wages and benefits as the employees of the primary employer. As such, it is not a union signatory clause, which would have required the general contractor to deal only with off-site union employers, but rather it is a union standards clause of the sort found valid by the District of Columbia Circuit in *Meat & Highway Drivers, Dockmen, Helpers & Misc. Truck Terminal Employees, Local Union No. 710 v. NLRB*, 335 F.2d 709 (D.C. Cir. 1964):

> To protect unit work by partially deterring such employer conduct, this clause would at least remove from the employer the temptation of cheap labor through substandard contractors. This is a usual function of a standards clause . . . . We need not assume that an employer would use such a tactic as here discussed; it is enough that the union could fear it, and seek such a clause to prevent it.

*Id.* at 716. The National Labor Relations Board has likewise found such standards clauses to be proper work-preservation provisions. *See Gen. Teamsters Local 386 (Construction Materials Trucking)*, 198 N.L.R.B. 1038, 1038 (1972) ("A union has a legitimate interest in preventing the undermining of the work opportunities and standards of employees in a contractual bargaining unit by subcontractors who do not meet the prevailing wage scales and employee benefits covered by the contract. Thus, its contract with an employer may require the employer, if it subcontracts, to subcontract to another employer who agrees to observe 'the equivalent of union wages, hours, and the like' provided for in the bargaining agreement.").

within the scope of Section 8(f): it "provid[ed] for union recognition, compulsory union dues or equivalents, and mandatory use of union hiring halls, prior to the hiring of any employees." *Bldg. & Constr. Trades Council*, 507 U.S. at 230.

Then, relying on *Forest City/Dillon-Tecon Pacific*, 209 N.L.R.B. 867 (1974) and *NLRB v. W.L. Rives Co.*, 328 F.2d 464, 469 (5th Cir. 1964), the district court held that a Section 8(f) agreement could not be extended to laborers who worked solely off-site. We agree with this conclusion as well. A Section 8(f) relationship cannot be imposed on workers who do not perform any tasks on the job site, but instead engage in prefabrication off-site. The reasons for this limitation are found in the text of the statute itself. Employees at a prefabrication plant are not "building and construction employees," but rather manufacturing employees in the traditional sense. They are not hired on a project-by-project basis, and therefore their employment is not temporary or transient such that the feasibility of representation elections is undermined. There is no reason to apply Section 8(f)'s "exception" to the general rule that union representation may be vivified only by "the voice of the majority of the employees in the unit." *NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers,* 434 U.S. 335, 344 (1978).

From these premises, the district court concluded that the LJAB and the NJAB violated established labor policy by rendering an award that extended the Project Labor Agreement, which incorporated Article II, Section 2 of the Local Agreement, to the off-site employees at Eisenmann's Crystal Lake prefabrication plant and IMF, Inc.'s employees at its Tennessee plant. We believe this conclusion to be erroneous because the arbitration award did not impose union representation upon, or extend the coverage of the Project Labor Agreement to, those off-site workers; rather, it protected the interests of Local 24's on-site workers by

bound be the Agreement. Third, Eisenmann claims that the arbitration decision, particularly the calculation of damages, did not draw its essence from the contract.

### A.

The National Labor Relations Act confirms the right of workers to organize and join labor organizations, to bargain collectively through chosen representatives, and "to refrain from any or all such activities." 29 U.S.C. § 157. A workforce's decision to organize, and its choice of a representative, are governed by majority rule. *See* NLRA § 9(a), 29 U.S.C. § 159 ("Representatives designated or selected for the purpose of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purpose of collective bargaining."); *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967) (holding that majority rule concept is at the center of federal labor policy). Majority status is established by an election conducted under the supervision of the National Labor Relations Board, NLRA § 9(c), 29 U.S.C. § 159(c), or by other means set forth in the Act. *See NLRB v. Canton Sign Co.*, 457 F.2d 832, 844 (6th Cir. 1972). Generally, employers who recognize a labor organization that does not have the majority support of workers, and labor unions that purport to represent workers absent such majority support, commit an unfair labor practice. *See* NLRA § 8(a), (b), 29 U.S.C. § 158(a), (b); *Int'l Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 738 (1961) (quoting *NLRB v. Penn. Greyhound Lines*, 303 U.S. 261, 267 (1938) ("The law has long been settled that a grant of exclusive recognition to a minority union constitutes unlawful support in violation of that section, because the union so favored is given 'a marked advantage over any other in securing the adherence of employees[.]'")).

Because of the lengthy procedure required to call, hold, and certify representation elections, the process ordained by

Section 9 has been found to be impractical in industries where there is a high labor turnover. Congress specifically has recognized that mandating representation elections in the construction industry would effectively preclude union representation of those workers. *See* S. Rep. No. 187, 86th Cong., 1st Sess. 55-56 (1959), 1959 U.S. Code Cong. & Admin. News, at 2318 ("Representation elections in a large segment of the [construction] industry are not feasible to demonstrate such majority status due to the short periods of actual employment by specific employers."). Thus, in 1959 an exception was created to permit employers in the construction industry to bargain with labor unions prior to the establishment of majority status through elections. Section 8(f) of the NRLA provides:

(f) Agreement covering employees in the building and construction industry.

It shall not be an unfair labor practice under subsections (a) and (b) of this section *for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members* (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such

employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: *Provided*, That nothing in this subsection shall set aside the final proviso to subsection (a)(3) of this section: *Provided further*, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

29 U.S.C. § 158(f) (some emphasis added).

Agreements made pursuant to Section 8(f) are commonly known as "prehire agreements." *See Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass.*, 507 U.S. 218, 230 (1993). Thus, we have held that in the construction industry, there can be two types of bargaining relationships under the National Labor Relations Act between labor unions and employers: "(1) a section 8(f) relationship which is established by a 'prehire' agreement which results from a contractor's voluntary recognition of a union; and (2) a section 9(a) relationship which results from certification of the union following a Board conducted election in which by majority vote the employees select the union as their bargaining representative." *NLRB v. Wehr Constructors, Inc.*, 159 F.3d 946, 950 n.3 (6th Cir. 1998).

The lower court held that the Project Labor Agreement constituted a valid prehire agreement under Section 8(f) between Eisenmann, as general contractor on the project, and Local 24, a conclusion which neither party disputes on appeal. We believe this holding is correct. All of the elements required by Section 8(f) were present. Eisenmann was an employer "engaged primarily in the building and construction industry" and Local 24 was a labor organization "of which building and construction employees are members." 29 U.S.C. § 158(f). The subject matter of the Agreement was