**STERLING FLUID SYSTEMS (USA), INC., Plaintiff,**

v.

**CHAUFFEURS, TEAMSTERS, & HELPERS LOCAL UNION # 7, AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Defendant.**

**No. 1:03–CV–135.**

United States District Court, W.D. Michigan, Southern Division.

Feb. 3, 2004.

Stephen S. Muhich, Dykema Gossett PLLC, Grand Rapids, MI, for plaintiff.

Michael L. Fayette, Pinsky, Smith, Fayette & Hulswit, Grand Rapids, MI, for defendant/counter-claimant.

Kim F. Ebert, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Indianapolis, IN, for plaintiff/counter-defendant.

## *OPINION*

QUIST, District Judge.

This matter involves an arbitration regarding the alleged breach of a collective bargaining agreement between Plaintiff, Sterling Fluid Systems (USA), Inc. ("Sterling"), and Defendant, the Chauffeurs, Teamsters & Helpers Local Union # 7, Affiliated with the International Brotherhood of Teamsters (the "Union"). The parties submitted their dispute to arbitration, which resulted in an award granting the Union full relief. Now before the Court are Sterling's Motion to Vacate the Arbitration Award and the Union's Motion for Summary Judgment to Enforce the Arbitration Award. For the reasons stated below, the Court will vacate the arbitration award.

### I. *Facts and Procedural Background*

The Court is bound by the arbitrator's findings of fact and therefore adopts the statement of facts made by arbitrator Gordon Byrholdt, attached as Exhibit 1 to the Union's brief in support of its Motion for Summary Judgment. *See Int'l Ass'n of Machinists & Aerospace Workers v. Tenn. Valley Auth.*, 155 F.3d 767, 771 (6th Cir. 1998) ("A court cannot make findings of fact independent of the arbitrator."). The arbitrator must make the factual findings, "and a court may not reject those findings simply because it disagrees with them." *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 370–71, 98 L.Ed.2d 286 (1987).

Sterling manufactures various types of pump products at several facilities. Three of these facilities remain in operation: La Boer in Alabama, Peerless in Indiana, and SIHI in Ontario, Canada. Sterling also owned and operated the small foundry facility at issue in this action, Process Metals Company ("PMC"), located in White Pigeon, Michigan. On August 27, 2000, Sterling entered into a collective bargaining agreement (the "CBA") with the Union, which represented 12–13 PMC production and maintenance employees. The CBA ran from August 27, 2000, through June 15, 2003.

A Management Rights Clause in Article II of the CBA states as follows:

> Subject to the provisions of this Agreement, the parties recognize that the management of the plant and the direction of the working forces remain vested in the Company. The management of the plant includes all the customary and usual rights, powers, functions, and the authority of management; such as, but not limited to, the right to plan, direct, and control plant operation; to hire, promote, transfer or demote; to suspend or discharge for cause; to maintain discipline and efficiency of employees; to issue and enforce reasonable rules and regulations; to introduce new and improved methods and facilities, or to change existing methods or facilities; to determine the products to be made or services to be performed, and those purchased from or made by other sources, or to be performed by outside contractors; and to perform all other actions which management believes necessary to maintain the Company in a sound competitive condition for the benefit of its employees and for the stockholders who have invested in the Company. Any controversy with respect to the above shall be subject to the grievance procedure.

(CBA Art. II, Compl. Ex. 1.)

A Subcontracting Clause in Article II of the CBA states:

> *Sub-contracting:* It is expressly understood that the Company may subcontract work which occurs because of emergencies, lack of required manufacturing equipment or techniques, unusual and urgent customer delivery requirements, lack of maintenance job skills, or for additional capacity. In doing so, the Employer agrees that it will not use any sub-contracting device primarily for the purpose of evading this Agreement.

(CBA Art. II.)

Finally, Article V of the CBA contains a clause setting forth the time limitations for filing grievances arising under the CBA:

> *Section 4. Time Limitation on Filing:* To be considered, a grievance must be reduced to writing in Step 1 within five (5) working days after the occurrence of the event giving rise to it, or knowledge thereof to the grievant. Failure to file grievance in the foregoing time period will constitute a waiver of said grievance, except as provided elsewhere in this Agreement. A grievance relating to discharge will be processed beginning at Step 2.

(CBA Art. V.)

According to Sterling witnesses, demand for Sterling products was slow in the 2000–2001 period and Sterling looked to possible economies in its operations. Among those operations analyzed was the PMC facility at White Pigeon. According to Sterling, the facility was too small to stand alone, and the company decided to close the plant. On January 18, 2002, the PMC plant manager notified all plant employees of Sterling's intention to close the facility. In a certified letter to the Union dated the

same day, which the Union received on January 23, 2002, Sterling notified the Union of its decision to begin a gradual downsizing of PMC in March 2002 and to close the facility on April 30, 2002. Sterling did not tell the employees that the plant's work was being transferred to other Sterling or non-Sterling plants.

On February 7, 2002, the molds and·dies necessary to carry out the manufacturing process at PMC were loaded onto trucks for shipment to Sterling's facility in Ontario, Canada, and to a non-Sterling operation in California. Also on February 7, 2002, the Union filed a grievance under the CBA challenging Sterling's decision to close the plant. The Union asserted that Sterling was in violation of a provision in the CBA restricting Sterling's ability to subcontract work out of PMC. The grievance stated: "The Company is in violation of Article II—Subcontracting by subcontracting our work out." Despite filing a grievance, the Union never sought an injunction to prevent Sterling from closing its plant or disposing of its property.

On August 15, 2002, the arbitrator held a hearing on the Union's grievance. On November 27, 2002, he issued a decision finding that Sterling had violated the CBA's Subcontracting Clause by unilaterally subcontracting the bargaining unit's work without consulting the Union. First, the arbitrator made clear his finding that this is not a "plant closure case," but rather a "subcontracting case." (11/27/02 Arb. Award at 5.) In the arbitrator's view, Sterling took grievable action not when it announced its decision to close PMC, but instead when it "made arrangements to contract out the bargaining unit work to its subsidiary in Ontario, Canada, and to another company in California, whose relationship to Sterling is unclear." (Id. at 6.) The arbitrator concluded that the CBA permits subcontracting *only* in the six circumstances enumerated in the Subcontracting Clause. (Id. at 12–13.) Because Sterling's activities failed to satisfy any of these circumstances, "there is no contractual justification for the subcontracting of the work at White Pigeon Foundry to another company." (Id. at 13.) Second, the arbitrator determined that the Union filed its grievance in a timely manner. The Union did not receive notice of what the arbitrator deemed Sterling's subcontracting arrangements until February 7, 2002, when trucks arrived at PMC to load tools and dies for shipment to Canada and California. (Id. at 6.) The arbitrator concluded that the CBA's five-day period for filing a grievance did not begin tolling until that happened, and because the Union filed its grievance on that day, the grievance was timely filed. (Id. at 7.)

As relief, the arbitrator ordered Sterling to reopen the PMC facility, rehire the Union employees, and give them back-pay:

Having found the Company in violation of its agreement with IBT Local 7, I conclude the Company must re-establish its operation at White Pigeon foundry and restore it to full operational capability.

The Company must rehire all its employees including replacements (if former employees are not available so as to maintain its capacity) to fully perform the production functions at the White Pigeon foundry as though there were no shut-down or transfer of work.

The Company shall offer full and complete reinstatement to all its former employees, together with all wages and benefits and rights including seniority as though they had never been laid off. These benefits and rights shall continue until the parties re-establish operations and regular employment at White Pigeon, or alternatively, the parties reach

an agreement mutually acceptable to both by way of resolution of this matter.

The Union shall be entitled to any and all records and information necessary to determine whether or not the White Pigeon foundry can be operated efficiently. In this regard, the Union is entitled to know what the terms and conditions of the agreements transferring the White Pigeon work to subcontractors in California and Ontario, Canada are as well as what other work formerly performed by Sterling employees has been assigned or transferred to subcontractors that could have been assigned to White Pigeon to give it the scale of operations Vice President Perrin indicated were needed for White Pigeon to remain viable.

Put another way, Sterling must be forthcoming with information necessary for the Union to evaluate and verify the effects of subcontracting the work at White Pigeon.

Back pay, if any, shall be calculated based on the rates of pay under the parties' contract, with vacation and health care benefits plus interest at the Chicago, Illinois prime rate, less earnings and other unemployment compensation benefits.

I shall retain jurisdiction of this matter to assist the parties in complying with this decision should they request my help. Until both parties jointly inform me in writing my services are no longer needed, my jurisdiction will continue.

(*Id.* at 13–15.)

On February 27, 2003, Sterling filed its Complaint Under Labor Management Relations Act to Vacate Arbitration Award (the "Complaint"). On April 4, 2003, the Union filed its Answer to Complaint Under Labor Management Relations Act to Vacate Arbitration Award (the "Answer") and its Counterclaim for Enforcement of Arbitration Award and for Damages for Breach of Contract (the "Counterclaim"). The Counterclaim argued that Sterling failed to implement the relief ordered in the arbitration award and thereby breached a provision in the CBA requiring "that the decision of the arbitrator shall be final and binding." (CBA, Article V, Section 3, Sub–Section 3.5.) In accordance with this Court's Case Management Order, Sterling filed its Motion to Vacate Arbitration Award on September 12, 2003. The Union filed its Motion for Summary Judgment to Enforce Arbitration Award on October 3, 2003.

Pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, this Court has jurisdiction over this action to enforce an arbitration award issued under the provisions of a collective bargaining agreement. The Union is a labor organization as defined in Section 2(5) of the Act, 29 U.S.C. § 152(5), and Sterling is an employer as defined in Section 2(2) of the Act, 29 U.S.C. § 152(2).

## II. *Standard for Motion to Vacate Arbitration Award*

■ The construction and interpretation of collective bargaining agreements is a task for labor arbitrators and not the federal judiciary. *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960); *see also AP Parts Co. v. UAW*, 923 F.2d 488, 491 (6th Cir. 1991) ("[T]his Court is very reluctant to vacate an arbitrator's award."). A court's review of an arbitrator's decision is very narrow; "one of the narrowest standards of judicial review in all of American jurisprudence." *Lattimer–Stevens v. United Steelworkers of Am., AFL–CIO*, 913 F.2d 1166, 1169 (6th Cir.1990).

The arbitrator must make the factual findings, "and a court may not reject those findings simply because it disagrees with them." *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987); *Int'l Ass'n of Machinists & Aerospace Workers v. Tenn. Valley Auth.*, 155 F.3d 767, 771 (6th Cir.1998). ("A court cannot make findings of fact independent of the arbitrator."). Furthermore, courts defer to the arbitrator's interpretation of a collective bargaining agreement. *Misco*, 484 U.S. at 37–38, 108 S.Ct. at 370; *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960) ("Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator."). This reflects an explicit policy preference for the private settlement of labor disputes under federal law. *See* 29 U.S.C. § 173(d) ("Final adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement."); *Misco*, 484 U.S. at 37, 108 S.Ct. at 370 ("[t]he reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations").

Although arbitrators are bound by certain limitations, their decisions are treated to a high level of deference:

> The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract.…[A]s long as the arbitrator is even arguably construing or applying the contract and acting within

the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision. *Misco*, 484 U.S. at 38, 108 S.Ct. at 371. "It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Enterprise Wheel*, 363 U.S. at 599, 80 S.Ct. at 1362, quoted in *Lattimer–Stevens*, 913 F.2d at 1169. "[I]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he made a serious error does not suffice to overturn his decision." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509, 532 U.S. 1015, 121 S.Ct. 1724, 1728, 149 L.Ed.2d 740 (2001) (internal quotations omitted).

If an arbitrator's decision and award "draw[s] its essence" from the collective bargaining agreement and is not merely the arbitrator's "own brand of industrial justice," the Court must uphold the award. *Eastern Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62, 121 S.Ct. 462, 466, 148 L.Ed.2d 354 (2000), quoting *Misco*, 484 U.S. at 38, 108 S.Ct. at 371. However, "[w]hen the arbitrator's words manifest an infidelity to th[e] obligation" to craft an award that draws its essence from the collective bargaining agreement, the arbitrator has exceeded the scope of his authority, and "courts have no choice but to refuse enforcement of the award." *Enterprise Wheel*, 363 U.S. at 597, 80 S.Ct. at 1361.

In *Beacon Journal Publishing Co. v. Akron Newspaper Guild, Local Number 7*, 114 F.3d 596, 599 (6th Cir.1997), the Sixth Circuit noted that "[d]espite the great amount of deference accorded an

arbitrator's decision," a court's review "is not toothless when an arbitrator's award disregards the collective bargaining agreement and its terms." *See also Lattimer–Stevens,* 913 F.2d at 1171–72 (listing in a dissenting opinion numerous cases setting aside arbitrators' decisions). An arbitrator does not have unfettered discretion when he departs from even arguably construing the contract. *Beacon Journal,* 114 F.3d at 600. Federal courts must not act as mere rubber stamps of approval on all arbitration awards. *Int'l Union of Elec., Elec., Technical, Salaried, Mach. & Furniture Workers, AFL–CIO v. Hurd Corp.,* 7 Fed.Appx. 329, 333, 2001 WL 210578 at *4 (6th Cir.2001). Courts have not backed away from reviewing an arbitrator's decision when that decision departs from any conceivable interpretation of the contract. *Beacon Journal,* 114 F.3d at 600 (citing opinions vacating arbitrators' awards).

■ The Sixth Circuit has adopted a four-pronged test to determine whether an arbitration award fails to "draw its essence" from a collective bargaining agreement and therefore should be vacated. The award fails when it: (1) conflicts with express terms of the agreement; (2) imposes additional requirements not expressly provided for in the agreement; (3) is not rationally supported by or derived from the agreement; or (4) is based on general considerations of fairness and equity instead of the exact terms of the agreement. *See Eisenmann Corp. v. Sheet Metal Workers Int'l Ass'n Local No. 24., AFL–CIO,* 323 F.3d 375, 380 (6th Cir.2003); *Int'l Bhd. of Teamsters, Local 519 v. United Parcel Serv., Inc.,* 335 F.3d 497, 507 (6th Cir.2003).

■ In addition, courts may upset an arbitration award if it is rendered in "manifest disregard of the law," *see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros,* 70 F.3d 418, 421 (6th Cir.1995), or if

it is contrary to a well-defined and dominant public policy, *see Eastern Associated Coal Corp. v. United Mine Workers of Am., Dist. 17,* 531 U.S. 57, 62, 121 S.Ct. 462, 467, 148 L.Ed.2d 354 (2000). Also, an arbitration award may be vacated based on arbitrator bias if the moving party demonstrates "evident partiality." *Andersons, Inc. v. Horton Farms, Inc.,* 166 F.3d 308, 328–29 (6th Cir.1998) (citing 9 U.S.C. § 10(a)(2)).

■ Federal law governs the enforcement and interpretation of collective bargaining agreements under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, but traditional rules of contract interpretation apply insofar as they are consistent with federal labor policies. *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. (UAW) v. Yard–Man, Inc.,* 716 F.2d 1476, 1479 (6th Cir.1983). Thus, the agreement must be considered as a whole to give meaning and effect to all of its provisions. *Paper, Allied–Indus., Chem. & Energy Workers Int'l Union v. Air Prods. & Chems., Inc.,* 300 F.3d 667, 676 (6th Cir.2002). To discern the intent of the parties, the Court must consider the explicit language of a collective bargaining agreement in the context that gave rise to its inclusion. *Yard–Man,* 716 F.2d at 1479. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. *Id.* The agreement "must be construed so as to render [no term] nugatory and [to] avoid illusory promises." *Id.* at 1480. The Court may look to other words and phrases in the collective bargaining agreement to resolve ambiguities. *Id.* Finally, the interpretation should not "denigrate or contradict basic principles" of federal labor law and policy. *Id.*

### III. *Discussion*

Sterling moves to vacate the arbitrator's award on four grounds. First, Sterling argues that the award does not "draw its essence" from the CBA. According to Sterling: the grievance was not timely filed pursuant to the CBA's strictures; Sterling's acts of concluding its business operations at the PMC facility were proper exercises of its powers under the CBA's Management Rights clause and did not constitute sub-contracting; and even if Sterling's activities were sub-contracting, they were consistent with the terms of the CBA. Sterling also maintains that the arbitrator's remedy is based on his own sense of fairness and equity rather than on the terms of the CBA. Second, Sterling argues that the arbitrator acted with manifest disregard for the law by accepting an untimely grievance and by failing to apply the explicit terms of the Management Rights clause. Third, Sterling contends that the arbitration award violates public policy by ordering a factory to re-open after it was closed due to its unprofitability. Fourth, Sterling maintains that the arbitrator exhibited bias by rendering a completely one-sided analysis and imposing an onerous punishment on Sterling as a remedy. For these reasons, Sterling asks the Court to vacate the arbitration award and dismiss the Union's counterclaim with prejudice.

The Court agrees with Sterling's position that the arbitration award fails to "draw its essence" from the CBA because Sterling's decision to close the PMC facility was a legitimate exercise of management power pursuant to the CBA, not subcontracting in violation of the CBA. The ruling gave short shrift to Sterling's argument that its decision to close the PMC facility did not constitute subcontracting, stating in the first two sentences of the discussion section: "The Employer urges that this is a plant closure case and not a subcontracting case. I disagree." (11/27/02 Arb. Award at 5.) Assuming at the outset that closing the PMC facility constituted subcontracting, the arbitrator proceeded to analyze. whether this purported subcontracting complied with the CBA's restrictions on subcontracting, concluding in the end that it did not. The arbitrator's characterization of Sterling's actions as "subcontracting" and not a "plant closure" was incorrect. A plant closure is a plant closure, and subcontracting is subcontracting. Here the plant was closed, and there is no indication whatsoever that the plant remains responsible for any production at any facility to which its work was transferred upon closure.

As the following discussion demonstrates, a company's decision to shut down a plant comprises a classic management decision, expressly protected in this case by the CBA's Management Rights Clause. Because the arbitration decision, without any rationale based upon the CBA, mistakenly analyzes the plant shutdown under the Subcontracting Clause, rather than under the Management Rights Clause, it is not rationally supported or derived from, and indeed conflicts with, the express terms of the CBA. Therefore, the arbitration award fails to "draw its essence" from the agreement and must be vacated. *See Eisenmann,* 323 F.3d at 380.

The CBA's Management Rights Clause reserves to Sterling "all the customary and usual rights, powers, functions, and the authority of management." These rights include, "but are not limited to," the power to "plan, direct, and control plant operation"; "introduce new and improved methods and facilities"; "change existing methods or facilities"; "determine the products to be made or services to be performed, and those purchased from or made by other sources, or to be performed by out-

side contractors"; and "perform all other actions which management believes necessary to maintain the Company in a sound competitive condition."

Numerous court decisions teach that the power to close down a manufacturing facility is a basic management prerogative; therefore, that power falls within the "customary and usual rights, powers, functions, and authority of management" reserved in the CBA to Sterling. In a seminal case, *First National Maintenance Corp. v. NLRB.*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), the Supreme Court held that an employer's decision to close down operations at one site for economic reasons was not subject to a duty to bargain under the National Labor Relations Act. While the duty to bargain issue is not germane to the present case, *First National's* characterization of a company's decision to shut down a facility is helpful. The Court's discussion suggests that this decision resides in the domain of management discretion because it involves a change in the scope and direction of the enterprise and is motivated by profitability concerns rather than merely by a desire to cut the labor costs of operations. *Id.* at 677, 101 S.Ct. at 2580. Accordingly, *First National* supports the notion that closing part of a business's operations is among the "customary and usual rights, powers, functions, and authority of management" contemplated by the CBA in the instant case.

In a similar vein, other cases have indicated that decisions to close or relocate plants are fundamental management choices that in this case would fall within the scope of the CBA's Management Rights Clause. The Supreme Court has depicted "[d]ecisions concerning the commitment of investment capital and the basic scope of the enterprise" as "managerial decisions, which lie at the core of entrepre-

neurial control." *Fibreboard Paper Prods. v. NLRB*, 379 U.S. 203, 223, 85 S.Ct. 398, 409–10, 13 L.Ed.2d 233 (1964). In *NLRB v. Royal Plating & Polishing Co.*, 350 F.2d 191, 196 (3d Cir.1965), the court characterized a company's decision to close a plant when "faced with the economic necessity of either moving or consolidating the operations of a failing business" as a "management decision[ ] which [is] fundamental to the basic direction of a corporate enterprise" and which lies "at the core of entrepreneurial control." Another case stated that a relocation decision, unlike a decision to subcontract, is "obviously closer to [being a] core entrepreneurial decision." *Rock–Tenn Co. v. NLRB*, 101 F.3d 1441, 1446 (D.C.Cir.1996).

Likewise, in *Davis v. NLRB*, 617 F.2d 1264, 1268 (7th Cir.1980), the court distinguished the facts before it from "a partial closing or a relocation" that would amount to "a change in the basic operation of the business required by economic necessity" and an exercise of the company's "managerial prerogative to terminate, relocate, liquidate, or sell his business or a part of it." Moreover, in *Arrow Automotive Industries, Inc. v. NLRB*, 853 F.2d 223 (4th Cir.1988), a company decided to close one of its plants due largely to a declining market and escalating production costs. "[D]ecisions of the magnitude involved here," the court explained, "remain management prerogatives." *Id.* at 230. The conclusion to be drawn from the aforementioned cases is that Sterling's decision to shut down the PMC facility was an exercise of customary management authority.

Not only is closing a factory inherently a management power and therefore reserved to Sterling under the CBA's Management Rights Clause, it also does not comprise subcontracting, and therefore does not implicate the CBA's Subcontracting Clause. Cases bear out the meaning of subcon-

tracting and show that completely shutting down a factory is not subcontracting. The Supreme Court in *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 213, 85 S.Ct. 398, 404, 13 L.Ed.2d 233 (1964) described subcontracting as replacing "existing employees with those of an independent contractor to do the same work under similar conditions of employment." The employer in *Fibreboard* did not shut down the plant, but instead decided to subcontract out to cheaper independent contractors certain maintenance work at the plant that had been performed by bargaining unit employees. *Id.* Replacing union labor with subcontracted workers at the factory triggered mandatory bargaining under the NLRA. Justice Stewart's concurring opinion intimated that subcontracting "falls short of such larger entrepreneurial questions as what shall be produced, how capital shall be invested in fixed assets, or what the basic scope of the enterprise shall be." *Id.* at 225, 85 S.Ct. at 410. Although *Fibreboard* did not specifically address itself to defining subcontracting, the aforementioned language helps illuminate the meaning of the word. Another court stated that "[i]t is doubtful that a plant closing and transfer of work to another subsidiary or division of the parent corporation can on the facts of this case fairly be described as subcontracting." *Retail, Wholesale & Dep't Store Union Local 1034, AFL–CIO v. Doxsee Food Corp.*, 650 F.Supp. 861, 864 (D.Del.1986) (citing *Int'l Union United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Lester Eng'g Co.*, 718 F.2d 818 (6th Cir.1983)).

Sterling and the Union challenge each other's interpretations of the CBA's Subcontracting Clause. That clause expressly permits Sterling to subcontract work outside of PMC due to "emergencies, lack of required manufacturing equipment or techniques, unusual and urgent customer delivery requirements, lack of maintenance job skills, or for additional capacity." It is not necessary for this Court to address the parties' respective arguments about whether this list is meant to be exclusive, as the Union argues, or merely a non-exhaustive recitation of examples, as Sterling argues. The CBA's Management Rights Clause permits Sterling to perform basic management functions. The decision to close the PMC facility is just such a function. And when Sterling moved the PMC tools and dies to Canada and California, it was simply taking reasonable and necessary steps to close the facility—not subcontracting.

To summarize, the arbitrator, in finding that Sterling violated the CBA, impermissibly disregarded the express terms of the Management Rights Clause and consequently rendered a decision not rationally supported by the CBA. *See, e.g., Int'l Bhd. of Teamsters, Local 519 v. United Parcel Serv., Inc.*, 335 F.3d 497, 506 (6th Cir.2003) ("[t]he arbitrator may not ignore the plain language of the contract"); *Wyandot, Inc. v. Local 227, United Food & Commercial Workers Union*, 205 F.3d 922, 929 (6th Cir.2000) ("An arbitrator is confined to the interpretation and application of the collective bargaining agreement, and although he may construe ambiguous contract language, he is without authority to disregard or modify plain and unambiguous provisions.") (internal quotation and citation omitted).

## IV. *Conclusion*

For the reasons stated above, the arbitration award must be vacated because it fails to draw its essence from the Collective Bargaining Agreement. Sterling's Motion to Vacate the Arbitration Award will be granted and the Union's Motion for Summary Judgment to Enforce the Arbitration Award will be denied.

An Order consistent with this Opinion will be entered.